**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**LITTLE ROCK DIVISION**

**TED CHANDLER and**
**MARTHA CHANDLER**                                                                    **PLAINTIFFS**

**v.**                                              **Case No. 4:14-cv-475 KGB**

**TRANSGUARD INSURANCE**
**COMPANY**                                                                             **DEFENDANT**

**v.**

**JOHNSON D. OGLES and**
**THE OGLES LAW FIRM, P.A.**                          **THIRD PARTY DEFENDANTS**

<u>**OPINION AND ORDER**</u>

Before the Court is defendant TransGuard Insurance Company's ("TransGuard") motion for summary judgment (Dkt. No. 14).  Plaintiffs Ted and Martha Chandler have responded, and TransGuard has replied (Dkt. Nos. 26; 29).  For the following reasons, the motion for summary judgment is denied

**I.      Factual Background**

The following facts are taken from Mr. and Mrs. Chandler's response to defendant TransGuard's Rule 56.1 statement in support of its motion for summary judgment (Dkt. No. 27), unless otherwise indicated.  On September 27, 2010, Mr. Chandler, the owner-operator of a 2005 International 9200I Tractor-Trailer, signed an agreement "with Intermodal Cartage Company, Inc. in Memphis, TN to operate a route between Intermodal's Dallas, TX and Memphis, TN terminals" (Dkt. No. 27, ¶1).  This agreement required Mr. Chandler to obtain occupational accident insurance coverage.  To meet this requirement, Mr. Chandler completed an application to join the National Association of Independent Truckers ("NAIT"), listing his home address in New Albany, Mississippi (Dkt. No. 15-4, at 1).  He also completed an application to enroll in

NAIT's group insurance program for occupational accident insurance.  Mr. Chandler ultimately enrolled in a group occupational accident and collision insurance policy that was issued and delivered by TransGuard to the NAIT.   Both TransGuard and the NAIT are located in Naperville, Illinois, and that is where the group insurance policy was issued and delivered.  Mr. and Mrs. Chandler are residents of Mississippi.  Mr. and Mrs. Chandler claim, and TransGuard does not dispute, that Mr. Chandler's certificate of insurance was delivered to him in Mississippi.

On January 18, 2011, Mr. Chandler was involved in a motor vehicle accident in West Memphis, Arkansas.  Mr. Chandler sustained personal injuries and property damage as a result of the accident.  He submitted claims for the damage to his truck to TransGuard under the property damage coverage of his insurance policy, and he assigned his property damage claim to TransGuard in the proof of loss.  He also incurred medical bills and lost wages, and he submitted those claims to TransGuard under the occupational accident coverage of his insurance policy.  TransGuard ultimately distributed $23,199.23 in property damage benefits and $157,449.83[1] in occupational accident benefits to and on behalf of Mr. Chandler.

Mr. Chandler's insurance policy with TransGuard ("the Policy") included a subrogation provision purporting[2] to give TransGuard the right to recover the amount of any benefits it paid to Mr. Chandler out of any recovery he obtained against a third party for his accident, regardless of whether Mr. Chandler was "made whole" (Dkt. No. 15-5, at 25).  Mr. Chandler initially retained attorney Vicki Gilliam to represent him in his personal injury suit arising out of his accident, and TransGuard communicated with Ms. Gilliam regarding its potential subrogation interest in the suit.  Almost a year later, on March 14, 2012, attorney Johnson Ogles informed

---

[1]   The occupational accident benefits consist of $115,075.03 in medical benefits and $42,374.80 in disability benefits.

[2]   Mr. and Mrs. Chandler admit that the Policy contains this provision, but they contest whether it has any legal effect.

TransGuard that he also represented Mr. and Mrs. Chandler in the suit.  Mr. Ogles' letter to

TransGuard stated:

> Vicki Gilliam and I represent Ted Chandler.  It is my understanding that your
> company has a subrogation lien.  Please send me a copy of the agreement you
> propose for subrogation.  In Arkansas we are allowed a one-third attorney's fee
> for collecting the subrogation for your company pursuant to A.C.A. §23-79-146.
> I am enclosing a copy of the statute.

(Dkt. No. 15-11, at 1).  The same day, Mr. Ogles filed a personal injury complaint on

behalf of the Chandlers, which did not include any allegations of property damage.

TransGuard responded to Mr. Ogles' letter the next day.  Kathy Maish, a

TransGuard employee, emailed Mr. Ogles informing him that:

> I have received your letter regarding the Oc/Ac lien.  We are in agreement in
> regards to the one-third attorney's fee for collecting on that lien.  We do however
> have a physical damage claim that will not be a part of that lien or the one-third
> attorney's fee.  I have spoken to Vicki Gilliam regarding this.  I provided the very
> powerful scene photos in exchange for the contact information on the negligent
> parties.  I would appreciate your cooperation by forwarding this contact
> information to me as soon as possible. . . .

(Dkt. No. 15-11, at 3).

On March 23, 2012, TransGuard retained separate counsel, Ryan Woody and

Matthiesen, Wickert & Lehrer, S.C., to monitor Mr. and Mrs. Chandler's personal injury

suit.  Although TransGuard had provided the photos, Mr. Ogles and Ms. Gilliam did not

supply the contact information for the negligent parties (Dkt. No. 15, ¶ 21).  Mr. Woody

contacted Mr. Ogles on March 25, 2012, regarding the case and whether any formal

agreement regarding the one-third reduction in the subrogation lien was made.  Mr.

Woody also asked Mr. Ogles about the property damage claim, which Mr. Ogles

responded to by writing that he and Ms. Gilliam "were led to believe that [TransGuard]

did not want us to pursue the property damage.  We will be glad to do so but we will need

to file an amended complaint" (Dkt. No. 15-2, at 2).

Mr. Woody wrote back that he would:

> [G]et authority from [TransGuard] for your representation on the property damage
> claim and then we can confirm an agreement on the 1/3 for both [subrogation]
> components in writing . . . I will be sure to get you the supporting documentation
> for the property damage claim once my client has approved the representation.

(Dkt. No. 15-2, at 1).  Mr. Ogles replied, writing "[j]ust send everything to us and we will add

the property claim in" (Dkt. No. 15-2, at 1).

On June 19, 2012, Mr. Woody sent Mr. Ogles a letter acknowledging and referencing

their previous correspondence, and Mr. Woody included documentation related to the property

damage claim.  The letter states, in part:

> Please let this follow on our prior email correspondence whereby you agreed to
> represent the subrogation interest of TransGuard Insurance Company relative to
> the property damage claim and protect the subrogation interest for medical and
> temporary total disability benefits paid.  In exchange, my client has agreed to a
> 1/3 reduction for your attorneys' fees.  Please let me know immediately if there is
> any misunderstanding. . . .  I would ask that you provide me with periodic updates
> as the case moves on and notify me of any settlement discussions or mediation.
> In addition, I will be your point of contact for TransGuard should you need
> anything. . . .

(Dkt. No. 15-2, at 5).  There is no indication in the record before the Court that Mr. Ogles

responded to, or confirmed, any statements included in this letter.

Several months passed without any amendment to Mr. and Mrs. Chandler's complaint

that would include the property damage claim.  On October 19, 2012, Mr. Woody contacted Mr.

Ogles to ask whether the complaint had been amended, and he expressed that TransGuard would

prefer to not have to intervene as a party to the suit.  Mr. Ogles responded by stating that "[w]e

intend to pursue it as we discussed" (Dkt. No. 15-2, at 7).

On November 14, 2012, Mr. Ogles next contacted Mr. Woody; he sent an email with an attached letter from one of the tort defendants asking why TransGuard allowed the attorney to obtain certain investigative documents.  Mr. Ogles stated, "We represent your company in this case."  (Dkt. No. 15-1, at 13).  In opposing the pending motion for summary judgment, Mr. Ogles disputes what he intended with this language.

On January 9, 2013, Mr. Woody again asked Mr. Ogles to confirm whether he was pursuing the property damage claim, as the complaint had not been amended to include any such claims.  Mr. Ogles responded, "Yes, we are pursuing it. we [sic] have an agreement. why [sic] do you keep asking me this question?" (Dkt. No. 15-2, at 11).  A month later, on February 6, 2013, Mr. Woody again contacted Mr. Ogles regarding whether an amended complaint would be filed to include the property damage claim.  Mr. Woody stated as follows in that correspondence:

> TransGuard has asked that I follow up with you on your plans to amend the Complaint to allege property damage.  As you know, we already have an agreement in place whereby TransGuard agreed to a 1/3 reduction in its medical and indemnity lien.  Based on that agreement, TransGuard would not formally intervene on that lien.  However, as you know Mr. Chandler's truck was significantly damaged and TransGuard paid $22,766.46 in property damage.  You advised that you would amend the Complaint to add a claim for property damage.
>
> I just reviewed the court's docket on Pacer and the Amended Complaint has not yet been filed.  Please advise when you intend to amend the Complaint or whether you would prefer that TransGuard retain Arkansas counsel to intervene on that portion of the claim.  I would like to have this issue resolved within 30 days so that we do not jeopardize the property damage claim.
>
> I look forward to hearing from you on the plan regarding property damage.

(Dkt. No. 15-2, at 15). Mr. Ogles responded by reiterating that "[w]e intend to amend and add the TransGuard claim" (Dkt. No. 15-2, at 16).  On February 11, 2013, Mr. Ogles filed a motion for leave to file an amended complaint that included the property damage claim, which was granted two days later.

Mr. Woody and Mr. Ogles continued to correspond regarding other issues pertaining to the case up to June 3, 2014.  Specifically, they corresponded regarding discovery issues related to TransGuard's claims; preparations for the depositions of Lynn Parrish, the Safety and Risk Manager for Intermodal Companies; and evidence for the upcoming June 2014 trial.  On or around June 10, 2014, Mr. Woody discovered that Mr. and Mrs. Chandler had settled the personal injury case.  Mr. Ogles never informed TransGuard of any settlement offers in the case, and Mr. Ogles first informed TransGuard that the case had settled after being contacted by Mr. Woody on June 10, 2014.

## II.    Standard of Review

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no disputed genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 852-53 (8th Cir. 2012).  The movant bears the initial responsibility of informing this Court of the basis for its motion and must identify those portions of the record which it believes demonstrate the absence of a disputed genuine issue of material fact.  *Id*.  If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a disputed genuine issue of material fact for trial.  *Id*.

For summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.  *Id.*  Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.  *Id*.  The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts; the nonmovant must come forward with specific facts showing that there is a disputed genuine issue of material fact for

trial. *Id.  See also Wingate v. Gage Cnty. Sch. Dist., No. 34*, 528 F.3d 1074, 1078–79 (8th Cir.

2008) ("Although the burden of demonstrating the absence of any genuine issue of material fact

rests on the movant, a nonmovant may not rest upon mere denials or allegations, but must instead

set forth specific facts sufficient to raise a genuine issue for trial.").  Where the record taken as a

whole could not lead a rational trier of fact to find for the nonmoving party, there is no disputed

genuine issue of material fact for trial. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th

Cir. 2011) (en banc) (internal quotation marks and citation omitted).  "The mere existence of a

scintilla of evidence in support of the plaintiff's position will be insufficient; there must be

evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 252 (1986).

### III.    Analysis

Mr. and Mrs. Chandler settled their personal injury case for $375,000.00 (Dkt. No. 2, at

1).  TransGuard claims that it is entitled to a portion of the settlement in accordance with the

subrogation provision included in Mr. Chandler's Policy (Dkt. No. 15-5, at 25).  Mr. and Mrs.

Chandler ask this Court to declare that they were not made whole by the tort settlement, and that

under the made whole doctrine as recognized under Arkansas and Mississippi law, TransGuard

has no right of subrogation to the settlement despite the contractual provision (Dkt. No. 26, at

22).  Mr. and Mrs. Chandler also request that the Court order TransGuard to pay certain medical

bills that they claim have not been paid.  They also ask that the Court determine which portion of

the settlement funds were for Ms. Chandler's loss of consortium claim.

TransGuard moves for summary judgment on several grounds:  (1) that Mr. and Mrs.

Chandler must reimburse them for all occupational accident benefits paid under the Policy

because the parties entered into an enforceable settlement agreement; (2) that the Court should

apply Illinois, not Arkansas, law and that, under Illinois law, TransGuard's contractual right to subrogation is not extinguished despite the fact that Mr. and Mrs. Chandler were not made whole by the settlement; (3) that, even if the Court finds that there was no enforceable settlement agreement and that Arkansas law applies, TransGuard is entitled to complete reimbursement for the property damage claim; and (4) that TransGuard has satisfied and has no further obligation to pay any outstanding medical provider liens or bills.

### A.    Subrogation For Occupational Accident Benefits

TransGuard paid Mr. and Mrs. Chandler $157,449.83 in occupational accident benefits as a result of Mr. Chandler's accident.  It is undisputed that Mr. Chandler's Policy includes a subrogation provision purporting to give TransGuard the right to recover this amount out of any recovery he has against a third party liable for his injuries, and that Mr. and Mrs. Chandler recovered $375,000.00 in the settlement of their personal injury case.  Mr. and Ms. Chandler argue that the made whole doctrine bars enforcement of the subrogation provision.  The made whole doctrine, as interpreted under Arkansas and Mississippi law, provides that "the insured must be wholly compensated before an insurer's right to subrogation arises; therefore, the insurer's right to subrogation arises only in situations where the recovery by the insured exceeds his or her total amount of damages incurred."  *Franklin v. Healthsource of Arkansas*, 942 S.W.2d 837, 840 (Ark. 1997); *see also Hare v. State*, 733 So. 2d 277, 284 (Miss. 1999) ("[T]his Court adopts the 'made whole' rule and holds that it is not to be overridden by contract language, because the intent of subrogation is to prevent a double recovery by the insured, especially here as expressly stated in the State Health Plan. Until the insured has been fully compensated, there cannot be a double recovery.").  TransGuard does not appear to dispute in their motion for summary judgment that Mr. and Mrs. Chandler were not made whole by their settlement.

Instead, TransGuard moves for summary judgment that the made whole doctrine does not apply for two reasons.  First, TransGuard argues that Mr. and Mrs. Chandler cannot assert application of the Arkansas made whole doctrine because they entered into an enforceable settlement agreement with respect to TransGuard's right to be reimbursed upon any settlement of judgment.  Next, TransGuard argues that its subrogation provision is enforceable, despite the fact that Mr. and Mrs. Chandler were not made whole, because the Court should apply Illinois law.   If TransGuard prevails on either of these arguments, TransGuard is entitled to recover the $157,449.83 paid to Mr. Chandler in conformity with the Policy.  The Court will address the conflict of laws issue first, as the Court's finding on this issue has bearing on the question of whether the parties entered into an enforceable settlement agreement.

## 1.      Conflict Of Law

The subrogation provision in Mr. Chandler's Policy provides that TransGuard is "entitled to a first priority right of reimbursement and subrogation regardless of whether 'you' recover all of 'your' damages or whether 'you' are made whole" (Dkt. No. 15-5, at 25).   Under Arkansas and Mississippi law, this provision is unenforceable, as the made-whole doctrine may not be eliminated by contract.  *Franklin*, 942 S.W.2d at 840; *Hare*, 733 So. 2d at 284.  Under Illinois law, the provision would be upheld and enforceable.  *Eddy v. Sybert*, 783 N.E.2d 106, 110 (Ill. App. Ct. 2003).  TransGuard offers two arguments for why the Court should apply Illinois law.

### i.      Express Choice Of Law In The Policy

TransGuard first claims that the Policy includes an express choice of law provision that dictates the use of Illinois law (Dkt. No. 18, at 12-13).  The policy TransGuard identifies as an express choice of law provision states:  "Conformity with State Statutes:  Any provision of this 'coverage part' which, on the date it takes effect, is in conflict with the laws of the state where it

is issued is amended to conform to the minimum requirements of said law" (Dkt. No. 18, at 13). TransGuard also directs the Court's attention to several Illinois amendatory endorsements contained in the Policy (Dkt. No. 18, at 13).

TransGuard correctly argues that Arkansas courts recognize and enforce valid express choice of law provisions contained in contracts (Dkt. No. 18, at 12).  However, the case cited by TransGuard in support of this proposition, *Crisler v. Unum Ins. Co. of Am.*, 233 S.W.3d 658 (Ark. 2006), undermines its argument that the "Conformity with State Statutes" provision included in the Policy was an express choice of law provision.  In *Crisler*, the Arkansas Supreme Court found that an essentially identical contractual provision did not constitute an express choice of law, as the language was ambiguous and "a reasonable construction of this provision is simply that any illegal provisions are void to the extent that they deviate from the law of the state in which the policy is delivered."  *Id.* at 660-61.  For the same reasons, the Court finds that the "Conformity with State Statutes" provision in the Policy in this case does not qualify as an express choice of law provision mandating the use of Illinois law.  TransGuard cites this Court to *Simmons v. Continental Casualty Company*, 258 F.Supp. 997, 1001−02 (D. Neb. 1968), *aff'd*, 410 F.2d 881 (8th Cir. 1969).  In that case, the district court determined that, under Nebraska conflicts law and prior Nebraska precedent, the district court should apply Illinois law to the case.  The Eighth Circuit determined that, regardless if Illinois or Nebraska law applied, the result would not differ.  The choice of law analysis in this case is not helped or controlled by *Simmons*, especially in the light of *Crisler*.

## ii.   Arkansas Choice Of Law Rules

As the Policy does not contain an express choice of law provision, the Court must conduct a conflict of laws analysis.  "District courts sitting in diversity apply the choice-of-law

rules of the state where they sit." *Winter v. Novartis Pharm. Corp.*, 739 F.3d 405, 410 (8th Cir. 2014).  Arkansas courts use different choice of law methods depending upon the type of claim at issue in the case.  TransGuard argues that, under Arkansas's choice of law rules, this Court should use the "most significant relationship" test to determine this choice of law question (Dkt. No. 18, at 14).  Mr. and Mrs. Chandler disagree, arguing that Arkansas courts would use Dr. Robert Leflar's "better rule of law approach" (Dkt. No. 26, at 20-22).

The Court finds that Arkansas courts would employ the "most significant relationship" test to resolve this issue.  While this case was not cited by either party, the Arkansas Supreme Court has held that, absent an express choice of law provision, the "most significant relationship" test should be used to determine questions regarding insurance policies.  *Hoosier v. Interinsurance Exch. of the Auto. Club*, 451 S.W.3d 206, 209 (Ark. 2014).  Even without this clear holding, the Court determines that use of the "most significant relationship" test is appropriate for this case.  Arkansas courts limit the use of Dr. Leflar's "better rule of law" approach to tort actions, while employing the "most significant relationship" test to contracts cases.  *See* The Hon. David Newbern, John J. Watkins, The Hon. D. Price Marshall & Brandon J. Harrison, *Arkansas Civil Practice and Procedure* § 6:1 (5th ed. 2015).  This case is more fairly characterized as a contract dispute:  the Policy provides that TransGuard has a right to subrogation even if Mr. Chandler was not made-whole, and Mr. Chandler argues that the provision is unenforceable under Arkansas law.

Under Arkansas's "most significant relationship" test as applied to automobile insurance, "unless some other state has a more significant relationship to the transaction and the parties, the law of the state which the parties understood to be the principal location of the insured risk during the term of policy controls." *Hoosier*, 451 S.W. 3d at 209 (paraphrasing the Restatement

(Second) of Conflict of Laws § 193 (1971)).  Therefore, the Court must first determine which state TransGuard and Mr. and Mrs. Chandler understood to be the principal location of the insured risk during the term of policy.  Then, the Court must determine whether another state has a more significant relationship to this transaction and the parties.

The principal location of the risk is the state where the "insured risk, namely the object or activity which is the subject matter of the insurance, has its principal location," meaning "the state where it will be during at least the major portion of the insurance period."  Restatement (Second) of Conflict of Laws § 193 cmt. b (1971).  In the case of an automobile liability policy, the principal location of the risk generally is the state where the vehicle is garaged.  *Id.* ("In the great majority of instances . . . it will usually be possible to predict with fair accuracy where the risk will be located, or at least principally located, during the life of the policy. . . . [I]n the case of an automobile liability policy, the parties will usually know beforehand where the automobile will be garaged at least during most of the period in question.").  The record before the Court in this case is insufficient to support a determination of the principal location of the risk.  Neither party properly addresses this issue in their filings.  The Court notes that Mr. Chandler listed his home address in New Albany, Mississippi, on his insurance application (Dkt. No. 15-4, at 1).  However, there is no indication that his vehicle was garaged in Mississippi.  Therefore, based on the record evidence before the Court, the Court cannot find as a matter of law that Illinois, Mississippi, Arkansas, or any other state was the principal location of the risk.

If the Court was able to determine the principal location of the risk, the Court would then evaluate whether another state has a more significant relationship to this case.  TransGuard contends that Illinois has the most significant relationship to the insurance policy at issue because Mr. Chandler's policy was part of a group insurance policy that was issued and

delivered in Illinois and because "in cases involving group insurance policies, the law of the state where the master group policy is delivered controls its choice of law questions" (Dkt. No 18, at 16). Transguard also claims that Arkansas's only contact to this matter is the fact that Mr. Chandler's accident occurred in Arkansas and contends that this contact is not significant enough to warrant the application of Arkansas law (Dkt. No. 18, at 15).

TransGuard correctly argues that, in a majority of jurisdictions, "[r]ights against the insurer under a group policy are generally governed by the law of the state where the master policy was delivered." *Karpenski v. Am. Gen. Life Companies, LLC*, 999 F. Supp. 2d 1218, 1229 (W.D. Wash.) *reconsideration denied*, 999 F. Supp. 2d 1235 (W.D. Wash. 2014); *see also* F. D. Puckett, *Conflict of Laws as to Group Insurance*, 72 A.L.R.2d 695 (originally published in 1960) ("[T]he large majority of the cases have concluded that the laws of that state should apply in which the master policy was delivered."). However, Arkansas is in the minority of states that have rejected this rule, finding that "[w]hen a master policy of group insurance is issued, there are at least two contracts. The group policy is one contract, and is usually said to be governed by the law of the place where it was delivered. The contract as to each individual within the group is separate." *Crisler*, 233 S.W.3d at 660 (quoting Robert A. Leflar *et al.*, *American Conflicts Law* § 153 (4th ed.1986)). Therefore, the Court finds that the law of the state where the group policy was issued does not necessarily govern in this case.

To determine which state has the most significant relationship to the transaction, courts consider five factors: "1) the place of contracting; 2) the place of negotiation of the contract; 3) the place of performance; 4) the location of the subject matter of the contract; [and] 5) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Crisler*, 233 S.W.3d at 660 (citing Restatement (Second) of Conflict of Laws § 188 (1971)).

Again, the existing record evidence before the Court is insufficient to support a determination of which state has the most significant relationship to this matter at this stage of the proceedings.

For example, in *Crisler*, the Arkansas Supreme Court found that a life insurance policy was negotiated and made partially in Arkansas and partially in Minnesota, where the insurance application was mailed from Minnesota to the insured in Arkansas, the insured completed the application and mailed it back to Minnesota, the insurer notified the insured that the application was approved and sent the certificate evidencing the insurance policy to Arkansas, and the insured began to pay for the insurance. *Crisler*, 233 S.W. 3d at 659, 661. On the record evidence before it, the Court cannot definitively determine where the contract was made and negotiated, because the record does not include facts establishing where Mr. Chandler received the insurance application and how he submitted it.[3] While it is undisputed that Mr. Chandler listed New Albany, Mississippi, as his home town on the application and that the certificate of insurance was mailed to his home address, these facts alone do not conclusively establish where the contract was made and negotiated (Dkt. No. 15-4, at 1; No. 27, ¶ 54). Similar issues arise with the third and fourth factors, pertaining to the place of performance and the location of the subject matter of the contract. Mr. Chandler applied for membership and occupational accident insurance coverage through the NAIT after he signed a contract to operate a trucking route between Dallas and Memphis (Dkt. No. 27, ¶ 1). However, the record is sparse as to where the place of performance and the subject matter of the contract were in this case. The only factor with sufficient evidentiary support is the fifth, as it is undisputed that the NAIT is located in Illinois and Mr. and Mrs. Chandler live in Mississippi.

---

[3] The insurance application directs applicants to mail the application to a post office box in Kansas City, Missouri (Dkt. No. 15-4, at 1). However, it is not clear whether Mr. Chandler actually mailed his application to Missouri or submitted it by other means.

The Court finds that the existing record is insufficient to determine as a matter of law at this stage which state's law governs the subrogation issues in this case.   Accordingly, TransGuard's motion for summary judgment that the Court should apply Illinois law is denied.

### 2.      Enforceable Settlement Agreement

TransGuard also argues that, even if the made whole doctrine applies, that Mr. and Mrs. Chandler "cannot assert application of the . . .  made whole doctrine because they entered into an enforceable settlement agreement with respect to TransGuard's right to be reimbursed upon any settlement of judgment" (Dkt. No. 18, at 9).  TransGuard claims that the terms of the "settlement agreement" were that it would not intervene in Mr. and Mrs. Chandler's personal injury suit, "where it would have sought recovery of 100% of its property damage and occupational accident benefits," and in return, it agreed to reduce both its occupational accident and property damage claims by one-third (Dkt. No. 18, at 9).  TransGuard, which avoided the cost of hiring its own attorney by virtue of this arrangement, argues that this agreement also benefited Mr. and Mrs. Chandler because it reduced TransGuard's subrogation claim by $60,959.48 and "eliminated any prospect that the jury would be negatively affected by the knowledge that the Plaintiffs would be making a double-recovery" (Dkt. No. 18, at 9).

The five essential elements of a contract claim under Arkansas law are:[4]  "competent parties, subject matter, legal consideration, mutual agreement, and mutual obligation." *Finch v. Carroll Cty.*, 445 S.W.3d 535, 537 (Ark. App. 2014).  Arkansas courts also are guided by two legal principals in determining the validity of a contract:  "(1) a court cannot make a contract for the parties but can only construe and enforce the contract that they have made; and if there is no

---

[4]  While the parties disagree over whether Arkansas law should be used in determining whether the made whole doctrine applies to the terms of the Policy, both cite to Arkansas cases in regard to this issue, which pertains to a separate "agreement" purportedly entered into by TransGuard and Mr. Ogles allegedly on behalf of Mr. and Mrs. Chandler.

meeting of the minds, there is no contract; and (2) it is well settled that in order to make a contract there must be a meeting of the minds as to all terms, using objective indicators." *DaimlerChrysler Corp. v. Smelser*, 289 S.W.3d 466, 470 (Ark. 2008).  TransGuard argues that all of the essential elements of contract formation are present in this case and that this Court "must 'construe and enforce the contract [the parties] have made'" (Dkt. No. 18, at 11) (quoting *Smelser*, 289 S.W.3d at 470).  Mr. and Mrs. Chandler argue that TransGuard is not entitled to judgment as a matter of law that a settlement contract was formed between them and TransGuard because it is not clear that there was a meeting of the minds as to the terms of any such agreement (Dkt. No. 26, at 7-8).  Specifically, in response to the summary judgment motion, Mr. and Mrs. Chandler argue that TransGuard put Mr. Ogles:

> on notice of a subrogation lien claim and their attorney acknowledged the existence of the subrogation lien claim and offered to include [TransGuard's] claim in the litigation if [TransGuard] recognized his right to a one-third attorney's fee for doing so. . . .  At no time did [Mr. Ogles] ever agree to do anything other than acknowledge the existence of the subrogation lien claims and to include those claims in his pursuit of the lawsuit on behalf of the Chandlers. No attorney/client relationship was ever formed between the Chandlers' lawyer and [TransGuard] and, in fact, [TransGuard] retained separate counsel to 'monitor' the lawsuit.

(Dkt. No. 26, at 2–3).

The terms of a settlement agreement, like any other contract, "must be definitely agreed upon and reasonably certain." *Roberts v. Green Bay Packaging, Inc.*, 272 S.W.3d 125, 128 (Ark. App. 2008).  This "meeting of the minds" on all material contract terms is necessary for a contract to be valid.  *Ward v. Williams*, 118 S.W.3d 513, 521 (Ark. 2003) (citing *Williamson v. Sanofi Winthrop Pharm., Inc.*, 60 S.W.3d 428, 434 (Ark. 2001)).  "Whether or not a meeting of the minds has occurred is an issue of fact."  *Rubber & Gasket Co. of Am. v. Zimmerman*, 2011 Ark. App. 273, 5 (2011).  More specifically to the issue presented in this case, "[w]hen there are

genuine questions of material fact with regard to a party's intent, summary judgment is improper." *Grayson & Grayson, P.A. v. Couch*, 388 S.W.3d 96, 104-05 (Ark. App. 2012).

Mr. Ogles, who was representing Mr. and Mrs. Chandler in their personal injury suit, corresponded with representatives from TransGuard regarding the suit and TransGuard's contractual subrogation interest.  TransGuard argues that this correspondence with Mr. Ogles constitutes a binding arrangement with Mr. and Mrs. Chandler.  There is no indication in the record before the Court that Mr. and Mrs. Chandler were aware of these communications, condoned them, or agreed to any arrangement between their lawyer and their insurance company.  Reasonable minds may differ as to who the parties were to this arrangement based on the existing record.

For example, one could determine that there may have been an arrangement between Mr. Ogles and TransGuard regarding the collection of any subrogation proceeds.  Mr. Woody wrote to Mr. Ogles on June 19, 2012, a letter that states, in part:

> Please let this follow on our prior email correspondence whereby you agreed to represent the subrogation interest of TransGuard Insurance Company relative to the property damage claim and protect the subrogation interest for medical and temporary total disability benefits paid.  In exchange, my client has agreed to a 1/3 reduction for your attorneys' fees.  Please let me know immediately if there is any misunderstanding. . . .  I would ask that you provide me with periodic updates as the case moves on and notify me of any settlement discussions or mediation.  In addition, I will be your point of contact for TransGuard should you need anything. . . .

(Dkt. No. 15-2, at 5).  There is no indication in the record before the Court that Mr. Ogles responded to, or confirmed, any statements included in this letter.

Further, Mr. Ogles did write on November 14, 2012, in correspondence to Mr. Woody, referring to TransGuard:  "We represent your company in this case."  (Dkt. No. 15-1, at 13).  Although Mr. Ogles in his response to the summary judgment motion now attempts to dispute

his intent in sending this November 2012 correspondence, he does not dispute the words he used. Instead, he argues that nothing in the record discloses an attorney-client relationship between Mr. Ogles and TransGuard.[5]  Mr. Ogles contends that, through this correspondence, TransGuard was an entity claiming a potential interest in a future settlement or verdict and that Mr. Ogles was agreeing to recognize such a claim in the course of his representation of the Chandlers (Dkt. No. 27, ¶ 33).  Mr. and Mrs. Chandler also cite this Court to non-controlling case law, *Gray Law LLP v. Transcontinental Ins. Co.*, 560 F.3d 361 (5th Cir. 2009).  From that case, it appears that Texas law has specific provisions governing such a situation; no party cites this Court to comparable controlling law that would dictate the outcome here.

TransGuard does argue that their "arrangement" benefited Mr. and Mrs. Chandler in the amount of $60,954.48 because TransGuard agreed to reduce its subrogation claim by one-third from approximately $182,878.05[6] to $121,918.57.[7]  The Court is unsure how this "reduction" was of any benefit to Mr. and Mrs. Chandler, as it appears that under the terms of the arrangement, the full $182,878.05 would still be removed from their tort settlement, with the only difference being that TransGuard would receive $121,918.57 and Mr. Ogles would receive $60,954.48.

Even if Mr. and Mrs. Chandler were parties to the contract, summary judgment is also inappropriate because there are genuine questions of material fact with regard to their intent.

---

[5]  It is unclear whether an attorney-client relationship between Mr. Ogles and TransGuard would even be permissible under Rule 1.7 of the Arkansas Rules of Professional Conduct under these circumstances.

[6]  This figure represents the combined total of the occupational accident and property damage benefits.

[7]  TransGuard also claims that Mr. and Mrs. Chandler were benefited because the arrangement "eliminated any prospect that the jury would be negatively affected by the knowledge that the Plaintiffs would be making a double recovery" (Dkt. No. 18, at 9). TransGuard points to nothing in the record indicating that such a benefit was contemplated by Mr. and Mrs. Chandler or Mr. Ogles.

While it is clear that Mr. Ogles recognized that Mr. Chandler's policy included a subrogation provision, his communications with TransGuard do not indicate whether he intended, on Mr. and Mrs. Chandler's behalf, to waive their rights under the made whole doctrine. It remains unclear what state's law applies in this case, for the reasons already stated. This ambiguity is important. For example, should Arkansas law apply to this case, TransGuard's contractual subrogation rights would arise only if Mr. and Mrs. Chandler were made whole by their recovery in their personal injury action. *Franklin*, 942 S.W.2d at 840. The communications between Mr. Ogles and TransGuard fail to address the possibility that, while TransGuard had a subrogation interest in Mr. and Mrs. Chandler's suit, it may not have any subrogation rights. The Court finds that a genuine question of fact remains as to whether Mr. and Mrs. Chandler intended to waive the made whole doctrine in their agreement, if one existed, with TransGuard.

Because there are genuine issues of material fact in dispute, this Court will not grant summary judgment to TransGuard on this basis.

### B.      Subrogation For Property Damage

TransGuard argues that even if the made whole doctrine under Arkansas law applies to this case and limits its recovery of the medical and disability benefits paid to Mr. Chandler, that it is entitled to complete reimbursement for its property damage subrogation claim. TransGuard claims that Ark. Code. Ann. § 23-79-146 limits the made whole doctrine under Arkansas law to not include reimbursement for property damages (Dkt. No. 18, at 19). In response, Mr. and Mrs. Chandler note that Ark. Code. Ann. § 23-79-146 "does *not* say anything about recoveries for property damage" (Dkt. No. 26, at 23). Mr. and Mrs. Chandler also argue that Ark. Code. Ann. § 23-79-146 could be construed to apply to property damage claims.

Considering the number of unresolved issues in this case, chiefly the question of which state's law governs the subrogation issues in this case, the Court finds that summary judgment on this issue would be premature.  Accordingly, TransGuard's motion for summary judgment on the property damage subrogation claim is denied.

### C.  Satisfaction And No Further Obligation To Pay Outstanding Medical Provider Liens Or Bills

Mr. and Mrs. Chandler claim that TransGuard failed to pay all of Mr. Chandler's medical bills, and attached allegedly unpaid bills from the North Mississippi Medical Center, the Shelby County Health Care Corporation, and the U.T. Medical Group to their complaint (Dkt. No. 1, at 8-13).   In its motion for summary judgment, TransGuard argues that it has paid the bills submitted to it for processing, adjusting, and payment from the North Mississippi Medical Center and the Shelby County Health Care Corporation.  Kathleen M. Maish, a subrogation analyst for TransGuard, states in a declaration that TransGuard paid all bills submitted by the North Mississippi Medical Center and the Shelby County Health Care Corporation, and "has issued no bill denials to North Mississippi Medical Center, Shelby County Health Care Corporation, or U.T. Medical Group" (Dkt. No. 16, ¶¶ 32, 37).  According to Ms. Maish, TransGuard "adjusted such bills based on the usual, customary and reasonable ("UCR") charge for the area," and issued payment to both the North Mississippi Medical Center and the Shelby County Health Care Corporation as satisfaction in full of its charges (Dkt. No. 16, ¶¶ 33-36).  In both cases, the payment was lower than the amount stated on the bill.  TransGuard argues that there is no genuine dispute of fact regarding Mr. Chandler's medical bills, and that this Court should rule as a matter of law that TransGuard "has satisfied and has no further obligation to pay any outstanding medical provider liens or bills pursuant to the express policy language" (Dkt. No. 18, at 20).

Mr. and Mrs. Chandler respond by arguing that TransGuard "asks this court to accept it at its word that it has applied its own internal payment processing policies and has paid all that it is required to pay for the medical liens and bills which were submitted to it" despite the fact that it is "pretty clear they paid far less than what the medical providers submitted in the way of invoices" (Dkt. No. 26, at 23).  They claim that "summary judgment on this issue would not be appropriate" because "the only way this court can make a determination if medical bills remain unpaid, or improperly paid, is to either require an audit to me [sic] made or to have an evidentiary hearing on this issue" (Dkt. No. 26, at 23).

The Court finds that there is not sufficient record evidence to permit the Court to rule as a matter of law that TransGuard has no further obligation to pay outstanding medical provider liens or bills.  The exact scope of what the Chandlers are claiming from TransGuard is unclear. Considering the state of the existing record, the Court denies TransGuard's motion for summary judgment on this issue as well.

**IV.    Conclusion**

TransGuard's motion for summary judgment is denied (Dkt. No. 14).

So ordered this the 31st day of March, 2016.

_Kristine G. Baker_
Kristine G. Baker
United States District Judge